# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| **REED COLLAR, et al., etc.,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) **CIVIL ACTION 14-0349-WS-B** |
| | ) |
| **TREVIS AUSTIN, etc.,** | ) |
| | ) |
| **Defendant.** | ) |

## ORDER

This matter is before the Court on the defendant's motion for summary judgment and the plaintiffs' motion for partial summary judgment. (Docs. 57, 66). The parties have submitted briefs and evidentiary materials in support of their respective positions, (Docs. 58-60, 67-70, 77, 86, 92), and the motions are ripe for resolution. After careful consideration, the Court concludes that the defendant's motion is due to be granted and the plaintiffs' motion denied.

## BACKGROUND

The plaintiffs' decedent ("Collar") was a student at the University of South Alabama ("the University") when, on the night of October 5-6, 2012, he was shot and killed by the defendant, a police officer employed by the University. Count One, brought pursuant to Section 1983, claims the defendant used excessive force in violation of the Fourth and Fourteenth Amendments. Count Two is a claim for wrongful death under Alabama law. The defendant is sued in both his individual capacity and his official capacity. (Doc. 1).[1]

---

[1] The plaintiffs concede they "cannot legally maintain an 'official capacity' claim against" the defendant. (Doc. 67 at 4 n.1).

The defendant seeks summary judgment based on qualified immunity as to Count One and state-agent immunity as to Count Two.  (Doc. 57 at 1).  The plaintiffs seek partial summary judgment as to the immunity defenses and further as to liability on Count One.  (Doc. 66 at 1).

## DISCUSSION

Summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  The moving party may meet its burden in either of two ways: (1) by "negating an element of the non-moving party's claim"; or (2) by "point[ing] to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden."  *Id*. "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial."  *Id*.; *accord Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000); *Sammons v. Taylor*, 967 F.2d 1533, 1538 (11th Cir. 1992).

"When the *moving* party has the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial. [citation omitted] In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof, no reasonable jury could find for the nonmoving party."  *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc) (emphasis in original); *accord Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

"If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if

any, showing the non-movant has made." *Fitzpatrick*, 2 F.3d at 1116; *accord Mullins*, 228 F.3d at 1313; *Clark*, 929 F.2d at 608.

"If, however, the movant carries the initial summary judgment burden ..., the responsibility then devolves upon the non-movant to show the existence of a genuine issue of material fact." *Fitzpatrick*, 2 F.3d at 1116. "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Clark*, 929 F.2d at 608 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted); *see also* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may … consider the fact undisputed for purposes of the motion ….").

In deciding a motion for summary judgment, "[t]he evidence, and all reasonable inferences, must be viewed in the light most favorable to the nonmovant …." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003). This standard applies fully in the qualified immunity context. *E.g., Gilmore v. Hodges*, 738 F.3d 266, 272 (11th Cir. 2013).

There is no burden on the Court to identify unreferenced evidence supporting a party's position.[2] Accordingly, the Court limits its review to the exhibits, and to the specific portions of the exhibits, to which the parties have expressly cited. Likewise, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment," *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995), and the Court accordingly limits its review to those arguments the parties have expressly advanced.

---

[2] Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."); *accord Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998) ("The district court has discretion to go beyond the referenced portions of these [summary judgment] materials, but is not required to do so.").

## I.  Evidence.

Because the evidence and inferences therefrom must be viewed most favorably to the nonmovant, in assessing the defendant's motion the plaintiffs' version of the facts (to the extent supported by the record) controls, though that version can be supplemented by additional material cited by the defendant and not contrary to the plaintiffs' version.

### A.  Evidentiary Challenges.

The plaintiffs have filed two motions to strike, (Docs. 64-65), while the defendant has filed four.  (Docs. 73-76).

As the Court has often noted, "the proper response to [objectionable] evidence … is to discount such materials, not to strike them from the record."  *Roy v. Correctional Medical Services*, 2014 WL 5285521 at *9 n.8 (S.D. Ala. 2014).[3] The Court therefore construes the motions to strike as motions to exclude the challenged evidence or to assign it no weight.

### 1.  Motion to strike evidence of what occurred before Collar arrived at the University police station.

Before encountering the defendant, Collar ingested a chemical known as "25I."  The defendant offers a state toxicological analysis report confirming the presence of this substance in Collar's body.  (Doc. 58-3 at 14).  The defendant also

---

[3] *Accord Morgan v. Bill Vann Co*., 2013 WL 4657554 at *1 n.1 (S.D. Ala. 2013) ("[M]ovant provides no explanation for why the draconian step of striking this testimony from the record (rather than simply finding that it fails to give rise to genuine issues of material fact on summary judgment) is an appropriate remedy."); *Mississippi Valley Title Insurance Co. v. Marion Bank and Trust Co*., 2012 WL 4856690 at *7 n.9 (S.D. Ala. 2012) ("The appropriate response to irrelevant evidence is not to strike the evidence but to consider it and afford it the weight (none) it deserves."); *see also English v. CSA Equipment Co*., 2006 WL 2456030 at *2 n.5 (S.D. Ala. 2006) (listing four circumstances under which striking evidentiary material might be appropriate).

offers statements from four witnesses regarding Collar's ingestion of 25I and his behavior after having done so but before he encountered the defendant.  (Docs. 58-1, -4, -5, -6).

The plaintiffs challenge the witness statements as irrelevant (since the defendant did not possess this information when he encountered Collar) and as inadmissible unsworn statements.  (Doc. 64 at 4-8).  The defendant admits that, because the statements are unsworn, they may not be considered by the Court.  (Doc. 58 at 2 n.2).  The Court has recently so held.  *Rachel v. City of Mobile*, ___ F. Supp. 3d ___, 2015 WL 3562273 at *3 (S.D. Ala. 2015).

The plaintiffs at one point object to the toxicological analysis report, (Doc. 64 at 2), but they do not in their conclusion seek its exclusion.  (*Id*. at 9).  Moreover, their only comment regarding the report is that "[i]t is not contested that Gil Collar ingested" what is now known to be 25I.  (*Id*. at 3).  Their points appear to be that the defendant did not know what Collar had ingested and that 25I was not illegal at the time.  (*Id*. at 3-4).  But the defendant makes no argument to the contrary.  The simple fact that Collar ingested 25I merely provides background, explaining the probable cause of his conduct and setting the stage for what transpired.

For the reasons set forth above, the plaintiffs' motion is **granted** with respect to the witness statements and **denied** with respect to the toxicological analysis report.

### 2.  Motion to strike expert opinions.

The defendant has provided testimony, based on his measurement of the distance covered and the time elapsed as shown on a police video, as to the speed at which Collar was moving in the final seconds before he was shot.[4]  University

---

[4] The plaintiffs attribute this evidence to both the defendant and the University police chief, (Doc. 65 at 3, 7), but the portions of the defendant's brief to which they cite reference only the defendant's deposition.  (Doc. 58 at 8-9, 10-11).

Police Chief Aull has provided testimony, based on the presence of stippling around the bullet entry hole, that Collar's chest was within two feet of the defendant's firearm at the moment of the shot.  Chief Aull and two officers (Parrish and Helton) have stated that the defendant did the right thing and/or that they would have done the same thing.

The plaintiffs describe all this evidence as expert testimony and challenge it for failure to comply with Rule 26(a)(2) and the Magistrate Judge's order concerning expert witnesses.  In addition, they deny the defendant is qualified as a "human factor or event reconstructionist" expert, and they claim his testimony is "materially flawed and inaccurate" for purposes of a *Daubert* analysis.  They also assert that Chief Aull admitted he is no expert and that his opinion regarding the distance between the defendant and Collar is contradicted by other evidence.  Finally, they complain that the defendant agreed Chief Aull would offer no testimony regarding the reasonableness of the shooting, that Parrish's testimony was unsolicited and exceeded the permitted scope of his deposition, and that Helton's statement was made on the scene, not as formal testimony under oath.  (Doc. 65 at 2-14).

### i. Speed.

"It's commonly understood that lay witnesses may estimate size, weight, distance, speed and time even when those quantities could be measured precisely." *Strong v. Valdez Fine Foods*, 724 F.3d 1042, 1046 (9th Cir. 2013).  "'The prototypical example of the type of evidence contemplated by the adoption of Rule 701 relates to … distance ….'"  *Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 241 (6th Cir. 2010) (quoting *Asplundh Manufacturing Division v. Benton Harbor Engineering*, 57 F.3d 1190, 1196 (3rd Cir. 1995)); *accord United States v. Conn*, 297 F.3d 548, 554 n.2 (7th Cir. 2002).

The defendant obviously has first-hand knowledge of the route he and Collar took, and he is permitted as a layman to offer testimony as to the distance

covered.  To the uncertain extent the plaintiffs suggest the defendant could permissibly *estimate* the distance as 50 feet but could not permissibly *measure* the distance as 50 feet using a measuring wheel,[5] they cite no authority remotely supporting such an implausible assertion.  If that were true, a layman could estimate the width of his countertop but only an expert could measure it with a yardstick; a layman could estimate the weight of a package, but only an expert could place it on a scale; a layman could estimate the length of her running route, but only an expert could measure it with a car odometer.  The Court has discovered no case suggesting that a measuring wheel (with its numberless varieties sold cheaply by the thousands from a wide range of retailers) is such an esoteric contraption that only an expert is qualified to use one.  Even had the plaintiffs identified any flaw in the defendant's use of a measuring wheel (and they have not), that would merely reduce his measurement to an estimate, which he is of course entitled to provide as a layman.

The police video, which contains a time counter, depicts the beginning and the end of the 50-foot traverse. From the video and counter, the defendant identified the elapsed time as approximately six seconds, a figure confirmed by the Court's review of the video.  Inexplicably, the plaintiffs insist without explanation that "looking at video time stamps" is a job that can be performed only by an expert, (Doc. 65 at 7), a revelation that must come as a shock to anyone who has ever used a camcorder or camera phone with a time counter.[6]

The defendant divided the distance traveled (50 feet) by the elapsed time (six seconds) to derive an average speed (8.33 feet per second).  The plaintiffs, again without explanation, describe this calculation as "an opinion of an expert

---

[5] The plaintiffs complain vaguely about "taking measurements."  (Doc. 65 at 7).

[6] The plaintiffs argue that, because the video does not clearly show the entire traverse, the defendant must be "guess[ing]." (Doc. 65 at 10).  This is a non sequitur. Only the length of the traverse, plus a video showing the beginning and end of the traverse and the times associated with each, are necessary in order to perform a mathematical calculation of average speed.

nature." (Doc. 65 at 3).  The quotient of simple division cannot possibly be a matter of opinion, and the formula for speed is taught to every middle school child in the land.  Both the formula and the calculation are matters of fact, not opinion.

Because the defendant's testimony regarding Collar's speed does not and need not involve any expert opinion, it is irrelevant whether he was identified or qualified as an expert.  Accordingly, the plaintiffs' motion as to this evidence is **denied**.

### ii. Proximity.

Chief Aull testified that he looked at photographs of Collar's body and noticed stippling at the entry point, which "told me that [the defendant] and Collar were two feet apart from the barrel of his gun when he pulled the trigger." (Doc. 65 at 11; Doc. 58-9 at 20-21).  The defendant acknowledges that Chief Aull's conclusion of a two-foot distance from the presence of stippling represents an opinion rather than a fact, but he argues it is a lay opinion under *United States v. Myers*, 972 F.2d 1566 (11th Cir. 1992).  (Doc. 78 at 11).

In *Myers*, the Eleventh Circuit ruled the trial court did not abuse its discretion in allowing as lay opinion the testimony of an officer that marks he observed on the victim's back were consistent with marks that would be left by a stun gun.  972 F.2d at 1577.  The Court noted that "[h]is conclusion was rationally based upon his personal perception of [the victim's] back and his nineteen years of experience on the police force." *Id*.  The defendant assumes that *Myers* stands for the proposition that any police officer with any considerable length of service may offer lay opinion testimony on anything related to police work.  (Doc. 78 at 13).

Rule 701 requires that a lay opinion be "rationally based on the witness's perception."  This requires that Chief Aull not only have perceived the stippling on Collar's body but also that he have past experience perceiving that stippling occurs only when the firearm is within two feet of the victim.  The *Myers* Court, utilizing a forgiving abuse-of-discretion standard of review, concluded that the witness's

8

nineteen years on the force could plausibly indicate he had experience observing marks left by stun guns, but the Court did not hold that such service must be deemed to demonstrate such experience.

The defendant has offered no evidence that Chief Aull has ever witnessed stippling in the past, much less that he knows from observation that stippling occurs when the barrel is within two feet but not when it is outside two feet.[7] Indeed, the defendant has offered no evidence of even the length of Chief Aull's law enforcement service.[8]

"The ultimate decision as to the admissibility of lay opinion testimony is committed to the sound discretion of the district court …." *Myers*, 972 F.2d at 1576-77. Given the defendant's failure of evidence providing a foundation for a proper lay opinion, the Court rejects the proffered evidence as lay opinion testimony.

Nor can the evidence be admitted as expert testimony. In accordance with Rule 26(a)(2), the defendant was required by court order to identify by May 18, 2015 any expert to be used in support of his motion for summary judgment. (Doc. 47 at 1). The defendant identified no expert, either by the deadline or at any later time.

"If a party fails to … identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that … witness to supply evidence on a motion …, unless the failure is substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). "The burden is on the party facing sanctions to prove that its failure to comply with Rule 26(a) was substantially justified or harmless." *Rembrandt*

---

[7] Chief Aull testified only that he "ha[s] an idea of what stippling is." (Doc. 58-9 at 21).

[8] The defendant asserts in brief that Chief Aull has 25 years of such service. (Doc. 78 at 11, 13). However, his only cited evidence reflects merely when Chief Aull completed studies at the Baton Rouge police academy; it does not address what he has done since then. (Doc. 78-1 at 3).

*Vision Technologies, L.P. v. Johnson & Johnson Vision Care, Inc.*, 725 F.3d 1377, 1381 (11th Cir. 2013) (internal quotes omitted).  Without acknowledging his burden, the defendant suggests several excuses for his violation, none of which are equal to the task.

The defendant first suggests his failure to identify Chief Aull as an expert is irrelevant because the plaintiffs elected to take his deposition.  (Doc. 78 at 16).  The cases on which he relies, however, state only that a party cannot complain when its questioning of a witness naturally elicits unfavorable testimony.  Nothing in these cases remotely supports the proposition that the failure to identify an expert can be excused because the opponent deposed a witness later claimed to be an expert.  The plaintiffs were entitled to assume that the defendant would offer opinions from Chief Aull, if at all, only as a layman.  This is especially so since defense counsel expressly stated at Chief Aull's deposition that "[m]y intention is to not disclose experts or use experts in support of the summary judgment motion."  (Doc. 65-1 at 10).[9]

The defendant also says his failure is irrelevant because the plaintiff could have deposed the medical examiner about stippling but chose not to do so.  (Doc. 78 at 14).  This is a non sequitur deserving no response.

Because Chief Aull's testimony can be admitted, if at all, only as an expert opinion, and because the defendant's procedural failing precludes him from using an expert witness, the plaintiffs' motion as to this evidence is **granted**.[10]

---

[9] Nor is the defendant correct in asserting that the plaintiffs' questioning elicited Chief Aull's testimony regarding a correlation between stippling and proximity.  (Doc. 78 at 10).  On the contrary, Chief Aull volunteered, without any question before him, his opinion as to the significance of the stippling.  (Doc. 58-9 at 20-21).

[10] The practical effect of this ruling is minimal.  Even were Chief Aull's testimony permitted, he testified (according to the deposition excerpts cited by the defendant) that stippling could occur from a distance as far as three feet.  (Doc. 58-9 at 25-26).  Since that is the version of Chief Aull's testimony most favorable to the plaintiffs, the Court would be required to accept the three-foot figure rather than the two-foot figure the defendant champions.  As discussed in Part I.B, the evidence most

### iii.  Reasonableness.

The plaintiffs understand the testimony of Chief Aull and Officers Parrish and Helton as being offered for the proposition that the defendant's act of shooting Collar was objectively reasonable and thus constitutional.  (Doc. 65 at 13).  Were that the defendant's purpose, it may well be that only expert testimony would be acceptable.  But the defendant offers the evidence, not to prove that his conduct was in fact constitutional but to show that, even if it was unconstitutional, a reasonable officer in his position could have believed it was constitutional, so as to clothe him with qualified immunity.  (Doc. 78 at 20; Doc. 58 at 28).  The plaintiffs in their reply brief ignore this important distinction, and the Court will not address it unilaterally on their behalf.  Accordingly, the plaintiffs' motion as to this evidence is **denied**.[11]

### 3.  Motion to strike plaintiff's affidavit.

The plaintiffs offer the affidavit of Bonnie Collar to show that Chief Aull made promises at freshmen orientation that are relevant to the "duties of care or standards" under Count Two.  (Doc. 82 at 4-5).  Because the Court resolves Count Two based on immunity, evidence of duties and standards of care are not relevant, and the Court thus has not considered Ms. Collar's affidavit.  Accordingly, the defendant's motion is **denied as moot**.

### 4.  Motion to strike defendant's recorded statement.

The defendant was interviewed by representatives of the Mobile County Sheriff's Department in the hours after the shooting.  The plaintiffs have submitted

---

favorable to the plaintiffs is that the distance from the defendant's gun to Collar's chest when the shot was fired was about three feet.

[11] However, this evidence plays no part in the Court's resolution of the qualified immunity issue.

a transcription of that interview.  The defendant objects that the transcription contains multiple errors and points out that a more perfect version exists.  (Doc. 74).  The plaintiffs move to substitute the better version, (Doc. 83), and the defendant does not object.  (Doc. 91).  Accordingly, the motion to substitute is **granted** and the motion to strike is **denied as moot**.  The Court will consider only the substituted statement.  (Doc. 83 at 4-16).

### 5.  Motion to strike dispatcher's statements.

Dispatcher Jeffrey Loman penned a handwritten statement concerning the incident.  He also gave an oral interview to Sheriff's Department representatives, which interview was reduced to a transcript.  The defendant objects that both documents are unsworn and are hearsay.  (Doc. 75).

"Unsworn statements do not meet the requirements of Fed. Rule Civ. Proc. 56(e) and cannot be considered by a district court in ruling on a summary judgment motion."  *Carr v. Tartangelo*, 338 F.3d 1259, 1273 n.26 (11th Cir. 2003) (internal quotes omitted); *accord Southern Grouts & Mortars, Inc. v. 3M Co.*, 575 F.3d 1235, 1248 n.8 (11th Cir. 2009).  As the Court has noted, "[w]hile these cases were decided under a previous version of Rule 56, the Eleventh Circuit has continued to apply the rule under the current version."  *Jackson v. Lee*, 2014 WL 4829552 at *2 n.5 (S.D. Ala. 2014) (citing cases).  Indeed, the plaintiffs insist that the rule be applied in this case.  (Doc. 64 at 8).

At his deposition, Loman listened to the audio version of his interview and read along with the transcript.  (Doc. 84 at 26-27).  He confirmed the accuracy of the transcript and then stated he knew it was important to tell the truth to the investigators and that he did so to the best of his ability, as fully and completely as he could.  (*Id*. at 27, 30-31).  The plaintiffs conclude that Loman confirmed under oath that his unsworn statement was true and thereby "adopted" the statement "under penalty of perjury," satisfying the requirement of a sworn statement.  (*Id*. at 4).  They cite the advisory committee note to Rule 801(d)(1), which states that,

"[i]f the witness admits on the stand that he made the statement and that it was true, he adopts the statement and there is no hearsay problem." Thus, "if the witness admits the truth of the prior inconsistent statements then the witness in effect adopts the prior statement [sic] as his present testimony, *given under oath* and subject to cross-examination. The hearsay element is no longer present." *United States v. Davis*, 487 F.2d 112, 123 (5th Cir. 1973) (emphasis added); *accord Amarin Plastics, Inc. v. Maryland Cup Corp.*, 946 F.2d 147, 153 (1st Cir. 1991); *Bell v. City of Milwaukee*, 746 F.2d 1205, 1274 (7th Cir. 1984). The defendant offers no relevant reply. (Doc. 87). The Court concludes that Loman's deposition renders his recorded statement both sworn and non-hearsay.

As to Loman's handwritten statement, the plaintiffs assert only that it might be admissible "at trial … depending on how Loman testifies at that time." (Doc. 84 at 7). Perhaps so, but the question is whether the statement can be used on motion for summary judgment, not at trial. Since the statement is unsworn and the plaintiffs offer no explanation how it can be deemed sworn or the oath or affirmation requirement excused, the statement cannot be considered.

For the reasons set forth above, the defendant's motion is **granted** with respect to Loman's handwritten statement and **denied** with respect to the transcript of his interview.

### 6. Motion to strike expert affidavit.

The plaintiffs offer the affidavit of Melvin Tucker to show that "the conduct of [the defendant] amounted to a Constitutional violation" and that the defendant "violated USA PD policies and procedures." (Doc. 80 at 3, 13). Because the Court resolves Count One on the grounds that no constitutional right violated by the defendant (if any) was clearly established, it is irrelevant whether the defendant violated the Constitution. And because the Court concludes that any violation of the policy on which the plaintiffs rely would not strip the defendant of state-agent immunity, it is irrelevant whether the defendant violated the policy.

The Court therefore has not considered the affidavit, and the defendant's motion is **denied as moot**.

### B.  Statement of the Evidence.

On the night of October 5, 2012, University student Collar ingested 25I, a synthetic drug then legal.  As the plaintiffs state, "this substance caused [Collar] to become impaired to the point that he completely disrobed and began to act irrationally" and "in a bizarre manner."[12]  At approximately 1:23 a.m. on October 6, 2012, Collar approached the University police station on campus, still naked.  A video camera mounted on the front of the building captured portions of what happened next.  Collar walked up to the front door before turning and walking away from the building, out of camera range.  Within thirty seconds, he returned.  He walked past the front door to a window, which he pounded violently with his right fist six times, throwing his whole body into each forward thrust.  He then turned and walked away, again out of camera range.

The defendant and Loman were the only persons inside the building.  The defendant was in a back room, completing an arrest report.  He jumped up from his chair when the pounding began and, before it had ended several seconds later, he had unholstered his Glock pistol and exited the room in a crouching position or tactical stance.  The pounding shook the entire building, and the defendant believed it was the result of gunshots or explosions.  Officer Parrish, who was in the side parking lot, thought the noise sounded like loud shotgun blasts.

The defendant first went to the dispatch room to check on Loman.  He asked Loman, "What was that?"  Loman answered that he didn't know but that it wasn't gunshots.  While they were talking, Loman saw Collar and told the defendant there was a guy outside and asked if he had made the noise.  For present

---

[12] (Doc. 64 at 4; Doc. 67 at 7).  The plaintiffs nevertheless object to the defendant's description of Collar as "drug-crazed."  (*Id.* at 25, 26).

purposes, the Court assumes Loman told the defendant the guy was sweaty and naked.[13]  The defendant did not see Collar at any point before he exited the building.

The defendant, in uniform, exited the dispatch room and issued a radio call: "Eleven, all units report to the office, there are several loud bangs that rocked the office."  He then exited the front door (which swings outward), 23 seconds after Collar's first pound on the window.  He exited with his firearm held in both hands, his arms extended, the gun pointing slightly down and not at anyone or anything.

Within about four seconds of the door beginning to open, the defendant observed Collar approaching him from the direction of the street, jumping up and down and extending his arms as he came within about six feet of the defendant. The defendant began backing up parallel to the front of the building, weapon trained on Collar, and ordered him to get on the ground.  Collar went to one knee and then both and said, "Shoot me," then immediately got back up and continued advancing on the defendant (who continued to back up during the two to three seconds Collar was not on both feet).  The defendant again yelled at Collar to get down on the ground, then did so a third time.  Instead, Collar continued advancing on the defendant, closing the gap between them to about two feet by the time he reached the end of the patio along the front of the building about eight seconds later.  He was walking about two miles per hour but again was jumping and swinging his arms as he did so.  The defendant interpreted Collar's movements as aggressive.  As he backed up, the defendant tried to unholster his pepper spray with one hand while holding his pistol in the other, but Collar began his bouncing

---

[13] This is a rather generous assumption.  The transcript of Loman's statement reads as follows:  "I said hey, there's a guy out there, you know, he's all sweaty.  He was all sweaty and naked.  I was like, was it him that made the noise?"  (Doc. 68-5 at 6).  The only statement to the defendant that the quoted material clearly captures is, "Hey, there's a guy out there."  The rest appears to be Loman telling the investigator what Collar looked like and musing to himself about his connection to the noise.

movements and closed the gap between them, causing the defendant to abandon the effort.

As the defendant exited the patio to the unpaved area beyond, he turned 90 degrees (toward the street) and picked up his pace in an effort to re-establish some distance between himself and Collar. He made another 90-degree turn parallel to the building and continued his accelerated pace over a grassy, sloping yard with oak tree roots, moving backward while keeping his eyes and firearm toward Collar.  Collar also accelerated, beginning with a long, lunging step seen on the video.[14]  The defendant accelerated about a second before Collar responded, but Collar, following the defendant's path, began closing the gap the defendant's head start had created.[15]  Throughout the defendant's retreat, he kept yelling, "Get down," and Collar kept repeating, "Shoot me" and "Kill me" while ignoring the defendant's orders.  When he was shot, Collar was about five feet from the defendant,[16] about three feet from the defendant's gun,[17] and advancing on the defendant at about 8 1/3 feet per second (or over 5½ miles per hour).[18]

---

[14] This is when the 50-foot, six-second segment referenced in Part I.A.2.ii commences.

[15] The plaintiffs suggest the Court, in its order on their Rule 56(d) motion, has already found that Collar only "maintain[ed] the distance between him[self] and" the defendant.  (Doc. 67 at 5; *id*. at 32 & n.24; Doc. 92 at 11 n.4).  The Court has made no such finding.  Instead, the Court stated only that, based on the video alone (which fails to capture most of the final six seconds and therefore "is limited in scope and largely inconclusive"), it could be that the defendant "simply maintain[ed] contact" with the defendant.  (Doc. 43 at 10, 12).  The defendant's testimony, and a careful observation of the delay captured by the video between his acceleration and that of Collar, establishes that the defendant's lead grew to approximately ten feet before Collar responded, then shrank to about five feet by the time the defendant fired.

[16] The plaintiffs appear to accept this figure, (Doc. 67 at 11), but in their first motion to strike they note in passing that the defendant initially told investigators Collar was five to ten feet away.  (Doc. 65 at 11).  The video conclusively disproves the higher figure.

[17] The plaintiffs admit, and the video confirms, that the defendant's arms were "fully extended" toward Collar.  (Doc. 81 at 3).

The defendant fired because, under the circumstances, he believed Collar would overtake him any second, gain control of his gun, and use the gun against the defendant.  The defendant did not know when backup would arrive, he did not know if Collar had accomplices, and he did not know that what had violently shaken the police building less than a minute earlier was not weaponry.[19]  From the moment the defendant first saw Collar until the shot was fired, 25 seconds elapsed.

Collar was 5' 9" and a muscular 148 pounds; the defendant is 5' 11" and 173 pounds.  When he fired, the defendant realized that Collar was naked, unarmed, and impaired in some respect.  At no point during the encounter did Collar touch the defendant, reach for his gun, or verbally threaten him with violence.  The defendant did not purport to arrest Collar and did not tell Collar he would shoot him if he did not stop.

---

[18] The plaintiffs argue the defendant's testimony as to speed is incredible because, in order for the distance between him and Collar to have increased (from two feet at the end of the patio to five feet when Collar was shot), the defendant would have to have been traveling 2.5 to 5 times faster than Collar.  (Doc. 66 at 8-9).  The argument erroneously assumes that Collar accelerated at the same instant the defendant did (rather than, as the evidence reflects, about a second later), but it is wrong on its own terms.  Were the plaintiffs' premise correct, the defendant would have covered 53 feet in the same time Collar covered 50 feet, a ratio of less than 1.1:1, not 2.5:1 or 5:1.

The plaintiffs also complain vaguely that the defendant's testimony as to distance (a predicate to the calculation of speed) is "in direct contravention" of what the video shows.  (Doc. 65 at 10).  This is a curious position, given that the plaintiffs in the same paragraph correctly note that the video does not actually depict most of the defendant's path.  (*Id.*).  The video patently is not in tension with the defendant's testimony as to a 50-foot traverse.

[19] The plaintiffs suggest the defendant could not reasonably have believed weaponry was involved, because Loman had said the noises weren't gunshots.  (Doc. 84 at 6).  But of course the defendant could have so believed, as Officer Parrish also believed.

Collar, shot in the chest, went to the ground.  After about seven seconds, he stood back up, crying out, "Shoot me again!" several times before wandering away and collapsing.

## II. Fourth Amendment Claim.

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "[T]he burden is first on the defendant to establish that the allegedly unconstitutional conduct occurred while he was acting within the scope of his discretionary authority."  *Harbert International v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998).  The burden then shifts to the plaintiff to show that the defendant's conduct "violated a clearly established statutory or constitutional right."  *Grayden v. Rhodes*, 345 F.3d 1225, 1231 (11th Cir. 2003).  The plaintiffs "do not contest" that the defendant was acting within the scope of his discretionary authority, and they acknowledge that this shifts the burden to them.  (Doc. 67 at 15).[20]

The lower courts have discretion whether to address first the existence of a constitutional violation or the clearly established nature of the right allegedly violated.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009); *accord Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012).  To avoid "the often more difficult question whether the purported right exists at all," *id.*, the Court addresses the latter issue first.[21]

---

[20] *See, e.g., Lewis v. City of West Palm Beach*, 561 F.3d 1288, 1291 (11th Cir. 2009) (when it is "undisputed … that the [defendants] were acting within their discretionary authority," a court can deem that element of qualified immunity established).

[21] "Because qualified immunity is only a defense to personal liability for monetary awards resulting from government officials performing discretionary functions, qualified immunity may not be effectively asserted as a defense to a claim for declaratory

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). "In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle*, 132 S. Ct. at 2093 (internal quotes omitted). "The salient question … is whether the state of the law at the time of an incident provided fair warning to the defendants that their alleged conduct was unconstitutional." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014). To attain that level, "the right allegedly violated must be established, not as a broad general proposition, … but in a particularized sense so that the contours of the right are clear to a reasonable official." *Reichle*, 132 S. Ct. at 2094. The law is clearly established if any of three situations exists.

"First, the words of the pertinent federal statute or constitutional provision in some cases will be specific enough to establish clearly the law applicable to particular conduct and circumstances to overcome qualified immunity, even in the total absence of case law." *Vinyard v. Wilson*, 311 F.3d 1340, 1350 (11th Cir. 2002) (emphasis omitted). The requisite fair and clear notice can be given without case law only "[i]n some rare cases." *Williams v. Consolidated City of Jacksonville*, 341 F.3d 1261, 1270 (11th Cir. 2003).

"Second, ... some broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts." *Vinyard*, 311 F.3d at 1351. "For example, if some authoritative judicial decision decides a case by determining that 'X Conduct' is unconstitutional without tying that determination to a particularized set of facts,

---

or injunctive relief." *Ratliff v. DeKalb County*, 62 F.3d 338, 340 n.4 (11th Cir. 1995); *accord Swint v. City of Wadley*, 51 F.3d 988, 1001 (11th Cir. 1995); *D'Aguanno v. Gallagher*, 50 F.3d 877, 879 (11th Cir. 1995). Thus, had the plaintiffs sought declaratory or injunctive relief, the Court could not bypass the question whether a constitutional violation occurred. But the plaintiffs seek no such relief. (Doc. 1 at 12). The Court has and expresses no opinion whether the defendant would be entitled to summary judgment based on the absence of a constitutional violation.

the decision on 'X Conduct' can be read as having clearly established a constitutional principle:  put differently, the precise facts surrounding 'X Conduct' are immaterial to the violation."  *Id.*  "[I]f a broad principle in case law is to establish clearly the law applicable to a specific set of facts facing a government official, it must do so with obvious clarity to the point that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted."  *Id.* (internal quotes omitted).  "[S]uch decisions are rare," and "broad principles of law are generally insufficient to clearly establish constitutional rights."  *Corey Airport Services, Inc. v. Decosta*, 587 F.3d 1280, 1287 (11th Cir. 2009).

"Third, [when] the Supreme Court or we, or the pertinent state supreme court has said that 'Y Conduct' is unconstitutional in 'Z Circumstances,'" then if "the circumstances facing a government official are not fairly distinguishable, that is, are materially similar [to those involved in the opinion], the precedent can clearly establish the applicable law."  *Vinyard*, 311 F.3d at 1351-52.

When case law is utilized to show that the law was clearly established, the plaintiff must "point to law as interpreted by the Supreme Court [or] the Eleventh Circuit," and such case law must pre-date the challenged conduct.  *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005); *accord Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011) (en banc).  Moreover, "[t[he law cannot be established by dicta[, which] is particularly unhelpful in qualified immunity cases where we seek to identify clearly established law."  *Santamorena v. Georgia Military College*, 147 F.3d 1337, 1342 n.13 (11th Cir. 1998) (internal quotes omitted).

The parties agree that the defendant's use of force is to be measured against the objective reasonableness standard of the Fourth Amendment.  (Doc. 58 at 21-22: Doc. 67 at 20-21).  "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them …."  *Graham v. Connor*, 490 U.S. 386, 398 (1989).  "The 'reasonableness' of a

particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id*. at 396-97.

According to the plaintiffs, the issue is whether it was clearly established in October 2012 "that use of deadly force, without warning, against a naked, unarmed, impaired minor suspect who was committing no serious crime, was not resisting, was not placed under arrest and who threatened no harm of serious injury or death to the officer, is unreasonable and excessive." (Doc. 67 at 19). However, the evidence viewed most favorably to the plaintiffs fails to support the proposition that Collar posed no threat of death or serious injury to the defendant. Nor does the plaintiffs' statement of the issue take into account other circumstances of this case, including what the plaintiffs themselves characterize as Collar's "bizarre" and "irrational" behavior.[22]

It is clear that Collar was a naked, unarmed, impaired minor, and it may be assumed for present purposes that he was committing no serious crime. It is also clear the defendant did not tell Collar he would shoot him if he did not halt, but that cannot be significant given that the plaintiffs themselves deem it "inexplicabl[e]" that the defendant would expect Collar to comply with his commands. (Doc. 67 at 10, 26). And while he may not technically have been resisting arrest (because the defendant was not attempting to arrest him), Collar was plainly non-compliant with repeated lawful orders to get on the ground, instead continuing his advance on the defendant.

That relentless advance, despite orders to stop, created an obvious and immediate threat to the defendant's life and safety. The defendant retreated the

---

[22] The plaintiffs admit that Collar's behavior in the defendant's presence was "bizarre." (Doc. 64 at 7).

full length of the patio, but Collar pursued him and closed the gap to two feet, with no indication he would not come closer.  The defendant accelerated his retreat after leaving the patio, but Collar then accelerated as well, closing the gap to about five feet – a distance he was covering in barely half a second.  Moreover, Collar had closed to within about three feet of the defendant's firearm and was in position to grab it with a single lunge.  The defendant – ignorant of when backup might arrive and moving rapidly backward over uneven terrain in the dark of night while keeping his eyes and gun on Collar (who could easily sustain and even further increase his speed, as the defendant could not) – was running out of options.

The plaintiffs argue the defendant could not reasonably have believed Collar was a threat to harm him, because his only words were, "Shoot me" and "Kill me," proving that Collar was a threat only to himself.  Moreover, they say, Collar never reached for the defendant or his gun, not even when he came within two feet of the defendant at the end of the patio.  (Doc. 67 at 10-11, 27-32).  But the excited, energetic and muscular Collar continued to advance on the defendant (and at an increasingly brisk pace), he continued to ignore orders to get on the ground, and he continued to tell the defendant to shoot him and kill him – words that reflected an obsession with the defendant's weapon and with extreme violence.  The defendant had also witnessed other manifestations of Collar's irrationality and unpredictability – in his nakedness, his pronounced and seemingly aggressive foot and arm movements, and his momentary partial compliance (when he went to his knees for an instant before rising again).  Finally, the defendant was faced with a sudden, unprecedented crisis, with no time to reflect or plan a strategy, much less perform a psychological assessment to confirm whether his irrational pursuer was harmless.

As noted, the test of reasonableness does not rest on hindsight but on the perspective of a reasonable officer on the scene, in possession of the facts and circumstances that confronted the defendant.  It therefore does not matter what Collar "really" would or would not have done, or whether (as the plaintiffs assert)

Collar was not trying to threaten the defendant but only making himself an easy target; what matters is whether a reasonable officer could or would have understood the facts and circumstances of the situation to reflect a threat of death or serious injury.[23]  For the reasons given above, that question must be answered in the affirmative.[24]

Based on the evidence as viewed most favorably to the plaintiffs, the question becomes whether, in October 2012, it was clearly established that using deadly force against a suddenly appearing, naked, unarmed, impaired minor – who posed an immediate threat of death or serious physical injury in that he was behaving irrationally, jumping and waving his arms, advancing swiftly on a retreating officer, repeatedly telling the officer to shoot him and kill him, and ignoring repeated orders to get on the ground – without first issuing a warning the minor would have ignored, would represent constitutionally excessive force.

The plaintiffs do not suggest that the language of the Fourth Amendment itself clearly establishes that the defendant's use of force was unconstitutional.

---

[23] *E.g., Penley v. Eslinger*, 605 F.3d 843, 852 (11th Cir. 2010) ("The relevant question is whether a reasonable officer in [the defendant's] shoes would have believed that Mr. Penley was gravely dangerous."); *Troupe v. Sarasota County*, 419 F.3d 1160, 1168 (11th Cir. 2005) ("Even if in hindsight the facts show that the SWAT Team could have escaped unharmed, a reasonable officer could have perceived that Hart posed a threat of serious physical harm."); *Robinson v. Arrugueta*, 415 F.3d 1252, 1256 (11th Cir. 2005) (similar); *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1246 (11th Cir. 2003) ("An objectively reasonable officer would have perceived McCormick as a threat.").

[24] Officer Parrish, while running to the scene from the parking lot in response to the defendant's radio call, observed the defendant quickly backing up across the yard as Collar "charged" him.  The plaintiffs, who insist that the term connotes an intention to "attack" and inflict "serious or deadly harm," (Doc. 67 at 27, 32), admit that "it might have appeared" to Officer Parrish (who was "only a few feet away" when the defendant fired) that Collar was charging the defendant.  (*Id*. at 26 n.19; Doc. 81 at 5).

Instead, they point to four Eleventh Circuit opinions they believe support their position.[25]

In *Salvato v. Miley*, 790 F.3d 1286 (11th Cir. 2015), the unarmed decedent was suspected of yelling at passing cars.  He was initially cooperative but then resisted arrest, hitting one officer twice and striking the defendant in the head, knocking her down.  The decedent retreated ten to fifteen feet from the defendant, who then shot him in the abdomen without warning; the decedent died at the scene from internal bleeding.  *Id*. at 1290-91.  Because the decedent "was retreating, apparently unarmed, and outside of striking distance," he "was not an 'immediate threat.'"  *Id*. at 1293.  The Court upheld the denial of qualified immunity because existing precedent[26] clearly established that "[u]sing deadly force, without warning, on an unarmed, retreating suspect is excessive."  *Id*. at 1294.

*Salvato* cannot clearly establish the unconstitutionality of the defendant's use of force because it is premised on the victim being in retreat and not posing an immediate threat to the officer or others.  Collar was not in retreat, was rapidly advancing on the retreating defendant, and was in striking distance; for that and other reasons previously explained, he posed an immediate threat of death or serious injury to the defendant.  *Salvato* holds that Y conduct (using deadly force) is unconstitutional in Z circumstances (without warning on an unarmed, retreating suspect).  In the words of *Vinyard*, the circumstances of *Salvato* are fairly distinguishable and thus incapable of clearly establishing that the defendant's use of force was unconstitutional.

In *Gilmere v. City of Atlanta*, 774 F.2d 1495 (11th Cir. 1985) (en banc), the defendant officers came to the decedent's home to investigate a complaint and

---

[25] The plaintiffs also rely on lower court cases and appellate cases from other Circuits.  (Doc. 67 at 20).  Since the law cannot be clearly established by such authorities, the Court does not discuss them.

[26] The date of the incident was July 6, 2012.  *Salvato v. Blair*, 2014 WL 1899011 at *1 (M.D. Fla. 2014).

ordered the decedent to their vehicle for questioning. The decedent "initially put up some resistance by attempting to flee and then flailing his arms about, but these efforts were ineffectual because of his drunken condition." *Id*. at 1496-97. The officers began beating the decedent about the head. The decedent broke free of their hold, and in the ensuing scuffle one of the officers shot him in the stomach, killing him. *Id*. The Eleventh Circuit ruled that a Fourth Amendment claim was presented, noting that, "[g]iven his small size, intoxicated state, and lack of a weapon, [the decedent] clearly posed little threat to [the officers'] safety when they initially began escorting him to the patrol car." *Id*. at 1503. By his ineffectual, drunken flailing, the diminutive defendant "did little to provoke the police officers to beat him," *id*., and it was this beating that prompted the decedent's "efforts to escape the officers' further physical abuse." *Id*. The shooter expressed fear of bodily injury from the decedent because he "was apparently free and moving toward him," *id*. at 1501, but this fear was "the fear of retaliation against his own unjustified physical abuse," which fear "should not preclude liability for a harm which largely resulted from his own improper use of his official power." *Id*.

*Gilmere* cannot clearly establish the unconstitutionality of the defendant's use of force because it is premised on the officer's fear of retaliation for his immediately preceding unconstitutional beating of the decedent. The defendant did not exert force against Collar before the shooting, much less unconstitutional force. Like *Salvato*, *Gilmere* at best establishes that using deadly force is unconstitutional in certain circumstances, which circumstances are not present here.

In *Morton v. Kirkwood*, 707 F.3d 1276 (11th Cir. 2013), an officer "shot an unarmed man in a stationary vehicle while having no reason to believe that the man would place anyone's safety in danger." 707 F.3d at 1282. *Morton* cannot clearly establish the unconstitutionality of the defendant's use of force because it

is premised on the absence of any threat to anyone's safety, a circumstance decidedly not present in this case.

Finally, in *Mercado v. City of Orlando*, 407 F.3d 1152 (11th Cir. 2005), the defendant officers responded to an attempted suicide call.  They found the plaintiff sitting on the kitchen floor, crying.  He was holding a knife with both hands, pointed at his heart, and a telephone cord was wrapped around his neck.  The officers ordered the plaintiff to drop the knife.  He did not do so, but neither did he make any threatening move toward the officers.  Within 30 seconds of ordering the plaintiff to drop the knife, and without warning him, the officers fired a baton from a distance of six feet with the energy of a professionally-thrown baseball.  The baton fractured the plaintiff's skull and resulted in brain injuries.  *Id*. at 1154-55.  The Court ruled that, because the plaintiff was not committing a crime, was not resisting arrest, and did not pose an immediate threat to the officers, the officers (if they aimed for the head, as the evidence suggested) used excessive force.  *Id*. at 1157-58.  *Mercado* cannot clearly establish the unconstitutionality of the defendant's use of force because it is premised on the victim posing no threat to the officers.  Again, that key circumstance is absent here.

The plaintiffs turn to a blanket criticism of the defendant's approach in the moments preceding the shooting.  They say the defendant should not have left the station at all, or at least not alone, before backup arrived; that he should have assessed the situation and formulated a plan before leaving the building; that he should not have exited the building with firearm drawn; that he should have soothed Collar rather than yelling commands at him; that he should have holstered his weapon in order to de-escalate the situation, resorting to non-lethal weapons if necessary; that he should have stalled Collar until backup arrived; and that he should have "render[ed] aid and assistance" to Collar.  (Doc. 67 at 3, 26-27, 31).  The complaint, however, limits their federal claim to "Defendant Austin's actions in shooting and killing" Collar, which actions are identified as the ones violating Collar's Fourth Amendment rights.  (Doc. 1 at 11).  Because the defendant's

previous actions are not made the basis of the constitutional claim, the plaintiffs cannot rely on them now to rescue that claim.

Even if it were properly before the Court, the plaintiffs have identified no Eleventh Circuit or Supreme Court authority clearly establishing that the defendant's conduct in these particulars violated the Constitution. Indeed, they have cited no authority at all. The Court, however, has recently addressed a similar issue. In *Rachel*, the plaintiff asserted she could base a Fourth Amendment claim on an officer's "provoking a confrontation with an emotionally disturbed felon." 2015 WL 3562273 at *9. The Court noted the absence of any binding authority clearly establishing such a proposition. On the contrary, the Court pointed to *City and County of San Francisco v. Sheehan*, 135 S.Ct. 1765 (2015), in which the Supreme Court "canvassed the case law and concluded that 'the officers' failure to accommodate [the plaintiff's] illness [did not] violat[e] clearly established law.'" *Rachel*, 2015 WL 3562273 at *10 (quoting *Sheehan*, 135 S. Ct. at 1775. Even under the Ninth Circuit law at issue in *Sheehan*, a plaintiff "cannot establish a Fourth Amendment violation based merely on bad tactics that result in a deadly confrontation that could have been avoided." 135 S. Ct. at 1777 (internal quotes omitted).

In summary, it was not clearly established in October 2012 that the defendant's use of force violated Collar's constitutional rights. Accordingly, the defendant is entitled to qualified immunity as to the plaintiffs' constitutional claim, and his motion for summary judgment as to Count One is due to be granted on this basis. The plaintiffs' motion for partial summary judgment as to qualified immunity is thus due to be denied, and their motion for partial summary judgment as to liability under Count One is due to be denied as moot (since the defendant prevails regardless of whether his conduct violated Collar's constitutional rights).

## III. Wrongful Death Claim.

Every peace officer … who is employed or appointed pursuant

27

>to the Constitution or statutes of this state, whether appointed or
>employed as such peace officer by the state or a county or municipality
>thereof, … and whose duties include the enforcement of … the
>criminal laws of this state, and who is empowered by the laws of
>this state … to arrest and to take into custody persons who violate,
>or who are lawfully charged by warrant, indictment, or other lawful
>process, with violations of, the criminal laws of this state, shall at all
>times be deemed to be officers of this state, and as such shall have
>immunity from tort liability arising out of his or her conduct in
>performance of any discretionary function within the line and scope
>of his or her law enforcement duties.

Ala. Code § 6-5-338(a).  "[W]hether a qualified police officer is due § 6-5-338(a) immunity is now judged by the restatement of State-agent immunity articulated by *Ex parte Cranman*, 792 So. 2d 392 (Ala. 2000)."  *Blackwood v. City of Hanceville*, 936 So. 2d 495, 504 (Ala. 2006) (internal quotes omitted).

"A State agent asserting State-agent immunity bears the burden of demonstrating that the plaintiff's claims arise from a function that would entitle the State agent to immunity."  *Ex parte Kennedy*, 992 So. 2d 1276, 1282 (Ala. 2008) (internal quotes omitted).  "Should the State agent make such a showing, the burden then shifts to the plaintiff to show that one of the two categories of exceptions to State-agent immunity recognized in *Cranman* is applicable."  *Id.* The plaintiffs concede that the defendant has met his burden.  (Doc. 67 at 35). The burden thus shifts to the plaintiffs to demonstrate an exception to the defendant's presumptive immunity.

The two *Cranman* exceptions are as follows:

>(1) when the Constitution or laws of the United States, or
>the Constitution of this State, or laws, rules, or regulations of this
>State enacted or promulgated for the purpose of regulating the
>activities of a governmental agency require otherwise; or
>(2) when the State agent acts willfully, maliciously,
>fraudulently, in bad faith, beyond his or her authority, or under a
>mistaken interpretation of the law.

792 So. 2d at 405.  In somewhat confusing and disjointed fashion, the plaintiffs in their brief appear to invoke several of these possibilities.  First, they argue the

defendant violated the Fourth Amendment.  Second, they argue the defendant violated Alabama law, specifically, Section 13A-3-23.  Third, they argue the defendant violated an Alabama rule or regulation, specifically, the University use of force policy ("the Policy").  Fourth, they assert indiscriminately that the defendant "acted willfully, maliciously, fraudulently, in bad faith, beyond his or her [sic] authority, or under a mistaken interpretation of the law."  (Doc. 67 at 36-40).

The threshold difficulty with the plaintiffs' approach is that their complaint expressly limits the defendant's loss of immunity to his having "acted beyond his authority as a sworn police officer by failing to discharge his duties in a manner consistent and in compliance with the policies, procedures, and rules of the USA Police Department with respect to the use of non-lethal and deadly force, all of which he violated."  (Doc. 1 at 14).  No other basis for stripping the defendant of his immunity is alleged, and none is properly before the Court.  But the plaintiffs would fare no better even had they not by their pleading disavowed any ground for denying state-agent immunity other than the defendant having acted beyond his authority.

The plaintiffs assume that a violation of the Constitution of itself strips a defendant of state-agent immunity.  (Doc. 67 at 36).  That, however, is not what *Cranman* says.  Instead, *Cranman* establishes that "a State agent shall not be immune from civil liability" when the Constitution "require[s] otherwise."  792 So. 2d at 405 (emphasis omitted).  The Constitution obviously does not "require" the stripping of immunity whenever a defendant has violated it, else there would be no such thing as qualified (or absolute) immunity.  Qualified immunity does not violate the Constitution but is consistent with it.  *E.g., Nixon v. Fitzgerald*, 457 U.S. 731, 747 (1982) ("Our decisions concerning the immunity of government officials from civil damages liability have been guided by the Constitution, federal statutes, and history.").  Because, as discussed in Part II, the defendant is entitled

to qualified immunity, the Constitution does not require that he be denied state-agent immunity.

Similarly, the plaintiffs assume that a violation of any Alabama law of itself strips a defendant of state-agent immunity. (Doc. 67 at 37). Again, that is not what *Cranman* provides. Instead, a state agent will not be immune when the "laws … of this State *enacted or promulgated for the purpose of regulating the activities of a governmental agency* require otherwise …." 792 So. 2d at 405 (emphasis added). Section 13A-3-23 is a state law, but it was not enacted for the purpose of regulating the activities of a governmental agency; it is simply Alabama's generic self-defense statute, applicable to all "person[s]," not governmental agencies.

This leaves for consideration only the preserved issue regarding the Policy.[27] In their brief, the plaintiffs describe the Policy as a "rule or regulation" for purposes of the first *Cranman* exception. (Doc. 67 at 37, 39). The Policy, however, is not a rule or regulation "of this State" but only an internal policy of the University police department. The plaintiffs have not attempted to demonstrate otherwise.

As noted, the complaint asserts that the Policy should be analyzed under the "acting beyond authority" exception to state-agent immunity. "One of the ways in which a plaintiff can show that a State agent acted beyond his or her authority is by proffering evidence that the State agent failed to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist." *Kennedy*, 992 So. 2d at 1282-83 (internal quotes omitted); *accord Giambrone v. Douglas*, 874

---

[27] The plaintiffs' mere recitation of a laundry list of *Cranman* exceptions (from willfulness through mistaken interpretation of the law), (Doc. 67 at 36), presents nothing for review. *E.g., T.P. ex rel. T.P. v. Bryan County School District*, 792 F.3d 1284, 1291 (11th Cir. 2015) ("[D]istrict courts should not be expected to construct full blown claims from sentence fragments ….") (internal quotes omitted); *Transamerica Leasing, Inc. v. Institute of London Underwriters*, 430 F.3d 1326, 1331 n.4 (11th Cir. 2005) ("[A] passing reference to an issue in a brief [is] insufficient to properly raise that issue.").

So. 2d 1046, 1052 (Ala. 2003).[28]  Mere "guidelines" are not enough to preclude immunity, but only "rules" that "*must* be followed by an officer."  *Ex parte Brown*, ___ So. 3d ___, 2015 WL 3367665 at *9 (Ala. 2015) (emphasis in original).  When a policy leaves matters to the agent's discretion, it will not support a denial of immunity.  *E.g., id*.

As relevant here, the Policy provides that "[i]t is the policy of the University of South Alabama Police Department to use deadly force only when … [t]he officer reasonably believes that his life is in jeopardy and that deadly force is immediately necessary to preserve the officer's life, or prevent serious bodily injury." (Doc. 68-2 at 3).  The Policy identifies the "Elements Necessary in the Use of Deadly Force" as intent, opportunity and ability.  (*Id*.).  That is, "the person intends to seriously injure or kill the officer or another person," he "is in range to seriously injure or kill the officer or another person," and he "has the means to seriously injure or kill the officer or another person."  (*Id*.).  "ALL THREE MUST BE PRESENT IN A LEGAL DEADLY FORCE SITUATION."  (*Id*.).

The plaintiffs focus on the word, "MUST," which they interpret as making the presence of these three elements "mandatory" before deadly force is employed. (Doc. 67 at 39).  But they overlook that the decision whether to use deadly force is left to whether the officer "reasonably believes" that his life is in jeopardy and "reasonably believes" deadly force is immediately necessary.  Thus, the three elements need not literally be present, as long as the officer reasonably believes they are present.[29]

The formation of a reasonable belief necessarily encompasses the exercise of discretion in evaluating and weighing – often, as here, in a mere instant – the

---

[28] "[T]he regulations need not be in the form of an actual checklist …."  *Ex parte Lawley*, 38 So. 3d 41, 48 n.1 (Ala. 2009).

[29] For example, the plaintiffs do not (and could not credibly) argue that the Policy forbids an officer's use of deadly force against someone pointing a gun at him simply because it later turns out the gun was unloaded or incapable of firing.

many and infinitely varied circumstances that may be presented in any given situation.  While it requires a reasonable belief in the danger of and need for deadly force, and while it identifies three things an officer must reasonably believe before he reasonably concludes his life is in jeopardy and that deadly force is immediately necessary to save it, the Policy does nothing to eliminate the officer's discretion in identifying and assessing the circumstances that will weigh into those calculations.  It does not, for example, forbid an officer to use deadly force against someone apparently on drugs or who is presently unarmed.

Thus, while the Policy to some degree cabins an officer's discretion to use deadly force, it does eliminate his discretion in determining whether he reasonably believes such force is justified.  The Policy therefore does not constitute the kind of "detailed rule or regulation" the violation of which could strip the defendant of state-agent immunity.

In summary, the defendant is entitled to state-agent immunity. Accordingly, his motion for summary judgment as to Count Two is due to be granted, and the plaintiffs' motion for partial summary judgment as to state-agent immunity is due to be denied.

## CONCLUSION

For the reasons set forth above, the defendant's motion for summary judgment is **granted**.  The plaintiffs' motion for partial summary judgment as to immunity is **denied**, and their motion for partial summary judgment as to liability under Count One is **denied as moot**.  Judgment shall be entered accordingly by separate order.

DONE and ORDERED this 15th day of September, 2015.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE